SO ORDERED.

SIGNED this 16th day of June, 2015.



_____
Janice Miller Karlin
United States Bankruptcy Judge

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:                                                    Case No. 11-21183
Dante A. Combs, and                                       Chapter 7
Alicia P. Combs,

                         Debtors.
_____

## Opinion and Order Granting
## Debtors' Motion to Reopen their Bankruptcy Case

Debtors Dante A. Combs and Alicia P. Combs filed a voluntary Chapter

7 Bankruptcy Petition in April 2011.[1] They received their discharge in August

2011, and the Court simultaneously closed their case.[2] In March 2014, Debtor

Dante Combs, a young African American man, sued Lounge KC, LLC,

Entertainment Concepts Investors, LLC, Entertainment Consulting

_____

[1] Doc. 1.

[2] Doc. 21.

International, LLC, and The Cordish Companies, Inc. (hereafter Cordish), for actions he now believes those entities initiated or sanctioned, or both, when, three times in a relatively short period of time, he was allegedly treated differently than Caucasian patrons of the Kansas City Power and Light District (P&L District).

The lawsuit, filed in the United States District Court, Western District of Missouri, alleges discrimination in violation of 42 U.S.C. § 1981.[3] But Cordish seeks to prevent Mr. Combs from presenting any evidence of that alleged discrimination, and recovering any damages resulting from it, if any, under theories of judicial estoppel, standing, and laches, arguing that Mr. Combs lost his right to proceed with the lawsuit because he waited too long to seek to amend his bankruptcy schedules to disclose this potential asset. The issue has surfaced in this Court via Debtors' Motion to Reopen[4] their 2011 Chapter 7 bankruptcy proceeding to allow them to list as a "contingent claim" the lawsuit against Cordish; Cordish has objected to that motion.[5] After hearing evidence, which included the sworn testimony of Debtor and his wife, the Court concludes both that Cordish lacks standing to pursue this objection

---

[3] Case No. 2014CV00227.

[4] Doc. 25

[5] Doc. 29.

2

and that Debtors' omission of the contingent claim was inadvertent. Because the Court finds that Cordish lacks standing to object, the Court overrules Cordish's objection. Because the Court finds that the Debtors' omission was an innocent mistake entirely devoid of bad faith, the Court grants Debtors' Motion to Reopen.

## I.   **Findings of Fact**

As a preliminary matter, ascertaining the truth of Mr. Comb's discrimination allegations against Cordish was not the purpose for the hearing held June 5, 2015. As a result, these background facts on the discrimination issue only present his side of the story. Conversely, the hearing gave both Cordish and Combs an opportunity to present evidence on facts relevant to reopening the bankruptcy, and the Court here makes findings of fact on that matter.

In August 2010, Combs was meeting friends in the P&L District at Makers Mark when he and one of his friends were attacked by another customer. Security personnel who may have been connected with Cordish detained him and his friend, but let the attacker—a Caucasian male, walk away. Combs was ultimately told to leave. At that time, he felt he had been treated unfairly, and it felt like discrimination because the Caucasian male who had started the fight was treated more favorably by the security

personnel. But it never occurred to him that he had enough evidence or any basis to bring any kind of lawsuit against the security staff; he never considered filing an action at that time. As a young black male, this was hardly the first time he had experienced discrimination, and he decided to just move forward instead of dwelling on the traumatic incident.

Combs was also during this time experiencing financial problems as a result of owning some rental housing units during the housing crisis.[6] He and his wife filed Chapter 7 bankruptcy about 8 months after the first P&L incident. On his Schedule B, item 21, Debtor was to list his "contingent and unliquidated claims of every nature;"[7] he did not disclose any potential lawsuit he might have against Cordish or anyone else.[8] When asked in this proceeding—some four years after he completed that Schedule, why he failed to list this as a "contingent" asset, he said although he reviewed his schedules and signed them under penalty of perjury, there was nothing about the P&L incident that would have made him consider it "property," or an "asset" or a "claim." He has no legal training, and nothing about the words used in Schedule B, # 21 made him even consider the single P&L incident that

─────────────────────

[6] Exhibit C, first paragraph.

[7] Doc. 1, Schedule B, "Type of Property, 21."

[8] He listed no claims against anyone in answering Question 21, including any claim he might have had against his actual attacker for assault.

occurred to him 8 months earlier as he completed his schedules. He had no intent whatsoever to file a lawsuit against anyone at the time he filed his bankruptcy petition; the P&L incident had occurred months earlier, and he had long since decided to just get on with life. He had no inkling that he might even have a claim, and thus had no motive to not list the lawsuit on Schedule B. It simply did not occur to him.

Creditors had until late August 2011 to file any objections to Debtors' discharge. None were filed, and, immediately after that deadline, the Court issued the discharge order and the bankruptcy case was promptly closed. Between the date the bankruptcy was filed and the discharge was granted—a time when little was going on in the bankruptcy as the parties were merely awaiting the running of the discharge objection deadline, Combs again went to the P&L District and once again experienced what felt to him to be discrimination. This time it was at a different club, where he had to stand in line to be admitted with friends. He was wearing typical business clothes for him (a suit or suit pants and a shirt), as his job as a pharmaceutical representative required, but the doorman several times denied him access to the club. Finally, when he insisted on knowing why, he was told to step out of line and show his driver's license, and then was told he was being denied access because his pants were "too baggy." This felt like pretense to him, but

once again, he processed what had happened to him, speaking with his lawyer friends, and decided that he should just forget the incident and try to move on.

A third incident occurred at the P&L district in July 2011, at yet another establishment—Tengos. Combs was attempting to text friends he was meeting, when an unknown Caucasian male knocked his phone from his hands, causing it to break and fall apart. He assumed the person was simply intoxicated and had been reckless until that man returned (as Combs was retrieving the phone pieces) and verbally assaulted him, used profanity and tried to pick a fight. Combs did not engage in the fight, but security personnel nevertheless suddenly surrounded Combs and escorted Combs out of the P&L district. Combs believes the attacker was, again, neither detained nor turned over to police.

Even after all three of these incidents, Combs apparently did not connect any dots. He again vented his frustration with friends, some of whom were lawyers, about the incident, but never considered that he had a claim or that he would sue anyone. That all changed—for the first time—three years later, in early 2014, when media reports surfaced alleging that management of the P&L district was employing purposeful strategies to discourage African Americans from coming to the district and/or encouraging them to get into fights so they would get kicked out of the district and/or be taken to jail. One

6

allegation was that P&L management was hiring (off the payroll) "white rabbits"—men hired to provoke fights.

After hearing these reports, Combs for the first time connected the dots and decided that he had been a target of deliberate discrimination. He considered the problem and decided that if anyone was going to take on this issue, and be a voice for social justice, it would have to be someone like him. Combs is a well-educated and articulate black male with a professional job and a family, with no criminal record—someone who a jury might find imminently believable. Only after consulting a lawyer in the spring of 2014 did he decide to file suit.

Cordish has now filed a summary judgment motion in that lawsuit, seeking to bar Combs from going to trial on these allegations. Cordish asserts two summary judgment theories that are relevant here: (1) that Combs lost his standing to sue Cordish when Combs declared bankruptcy, because if the suit is an asset, only the Chapter 7 Trustee assigned to his case, Steve Rebein, would have standing, and (2) that Combs must be judicially estopped from suing Cordish and recovering any damages because Combs failed to list the "claim" he had against them when he filed his bankruptcy petition in April

2011.[9]

When Combs learned of this defense to his suit, he came to understand—for the first time—that Cordish was interpreting the single pre-petition incident at Makers Mark in August 2010 as a "contingent claim" and that they were asserting he should have listed that "asset" on Schedule B. Although he still didn't understand how the incident could be construed an asset or property, he decided to put the issue to bed by simply amending Schedule B to list the lawsuit. He followed his bankruptcy lawyers' advice to seek to reopen his bankruptcy to list this lawsuit (or at least any portion of any damage award that might accrue from the seemingly smaller piece that occurred pre-petition), fully recognizing that if he were to recover any damages

---

[9] Although Cordish argues that Debtors should have updated their schedules after the second and third incidents, the Court notes that Cordish has supplied no binding Tenth Circuit precedent for its argument that Debtors, who filed a Chapter 7 bankruptcy, were under a continuing obligation to update their schedules to reflect the changing nature of the claim at issue here. The Tenth Circuit suggests that courts requiring an update to the schedules take a minority view, and the Tenth Circuit has explicitly rejected arguments for judicial estoppel based on a failure to update the schedules in a Chapter 7 proceeding. "[I]t appears that the view that a debtor's duty to amend a properly reported schedule with new information about the evolving estimate of value of a litigation claim is a minority view at best. If we are going to weigh in on this issue in this circuit, it should be in a bankruptcy case where the question is whether a discharge of bankruptcy should be granted to a debtor given his failure to amend his schedules, and not in a judicial estoppel case." *Vehicles Market Research v. Mitchell Int'l*, 767 F.3d 987, 999 (10th Cir. 2014). The Court will not evaluate the Debtors' failure to update their schedules after the second and third alleged incidents, but focuses instead on Debtors' failure to disclose the claim based on the first incident.

from the initial incident, that the Chapter 7 trustee would have the opportunity to elect whether to administer those funds for the benefit of his unsecured creditors.

Cordish has objected to the Motion to Reopen, claiming it is too late for Combs to amend his schedules and claiming that Combs is not acting in good faith. Cordish tried to establish at the trial on this motion that Combs is motivated not by a true desire to list the asset to potentially get a recovery for his unsecured creditors, but to line his own pocket with any damage award.

At the trial, attended by Rebein, the Court asked Rebein whether he had had an opportunity during the relatively short time the Motion to Reopen had been on file to consider the value of this potential asset and whether he wanted to administer this potential asset as the Trustee. Rebein indicated he had fully investigated this asset—the single pre-petition incident that was the first of three incidents that constitute the lawsuit, and that he intended to abandon it, as he did not believe it held any value to the estate worth administering.[10]

---

[10] Cordish argues the Court should "have doubts about Mr. Combs' innocent intentions"regarding the failure to include the claim on Schedule B because Mr. Combs stated in an affidavit that he had paid his creditors in full, notwithstanding receipt of a discharge, when he has apparently not paid all of them. While no court ever condones any false statement, this testimony did not serve to undermine the Court's overall belief in the credibility of Mr. Combs' testimony on the main issues surrounding the Motion to Reopen.

9

## II.    Analysis

This matter constitutes a core proceeding over which the Court has the jurisdiction and authority to enter a final order.[11]

The decision to reopen a bankruptcy case is within the discretion of the bankruptcy judge.[12] A court's discretion to reopen a case is broad but must be "tethered to the parameters of § 350(b)."[13] Section 350(b) allows a case to be reopened in the court where it was closed "to administer assets, accord relief to the debtor, or for other cause." As a practical matter, motions to reopen a case should only be granted if the underlying relief requested can be granted by the bankruptcy court.[14] Here, the underlying relief requested is the addition of this lawsuit to the Debtors' list of personal property in Schedule B, and that question, whether Debtors may amend their schedules to add this asset, ultimately controls whether the Court can and should grant their motion to reopen.

As a preliminary matter, Debtors argue that Cordish lacks standing to

---

[11] See 28 U.S.C. § 157(b)(2)(A) (stating that matters concerning the administration of the estate are a core proceeding); § 157(b)(1) (granting authority to bankruptcy judges to hear core proceedings).

[12] *See, e.g.*, *In re Rosinski*, 759 F.2d 539, 541 (6th Cir. 1985).

[13] *In re Apex Computer Corp.*, 71 F.3d 353, 356 (10th Cir. 1995).

[14] *In re Jester*, 2014 WL 7408943 at *2 (Bankr. E.D. Okla. 2014) (citing *In re Schicke* 290 B.R. 792, 798 (10th Cir. BAP 2003)).

Case 11-21183    Doc# 43    Filed 06/16/15    Page 10 of 23

object to the Motion to Reopen.[15] In the Tenth Circuit, at the appellate level, a party appealing a court's decision to grant a motion to reopen must meet the "person aggrieved" standard, under which appellate review is available only to "those persons whose rights or interests are directly and adversely affected pecuniarily by the decree or order of the bankruptcy court."[16] And the Tenth Circuit BAP has ruled that a defendant, like Cordish, in a separate action brought by a debtor, does not meet the person aggrieved standard and thus lacks standing to object to a motion to reopen.[17] As a result of this binding precedent, the Court concludes that Cordish lacks standing to pursue this objection, and therefore overrules its objection.

Nevertheless, because reopening is a discretionary action by the Court, the Court must still weigh the merits of the Motion to Reopen and determine whether to grant that motion. In weighing that Motion, the Court finds that Cordish's arguments frame the main issues surrounding the Motion, and so

---

[15] Although this issue was raised by the Combs before Cordish's brief was due, Cordish regrettably elected not to address its own standing.

[16] *Holmes v. Silver Wings Aviation, Inc.*, 881 F.2d 939, 940 (10th Cir.1989) (internal quotation marks omitted).

[17] *Riazuddin v. Schindler Elevator Corp.* (*In re Riazuddin*), 363 B.R. 177, 183 (10th Cir. BAP 2007) ("Appellee's claim that its defense in the personal injury case may be affected by the reopening is insufficient to give it a direct interest in the Debtors' bankruptcy case, and therefore, it lacked standing to oppose the motions to reopen.").

11

the Court will analyze the Motion around their arguments.

The Court notes that, although the district court in the discrimination suit in Missouri will apply Eighth Circuit law, this Court is bound by Tenth Circuit precedent in interpreting the motion to reopen (here, for the purpose of amending Schedule B). The Tenth Circuit has addressed the standards for evaluating a debtor's motion to amend:

> Debtors may amend bankruptcy schedules as a matter of course. But an amendment may be denied, however, if there is bad faith by the debtor or prejudice to creditors. . . . The Bankruptcy Code does not define bad faith. Like most questions of motive and intent, bad faith is a question of fact. Bad faith may be established by circumstantial evidence, or by inferences drawn from a course of conduct. . . .
>
> We also recognize that an inadvertent omission may be an affirmative defense to a debtor's failure to disclose an asset in bankruptcy. Inadvertence can be established by showing, among other things, either (1) the debtor had no knowledge of the undisclosed asset, or (2) the debtor had no motive to conceal it. The burden of establishing inadvertence lies with the debtor.[18]

Here, Cordish argues that the motion to reopen (and, implicitly, the eventual amendment of the schedules) should be denied based on the theory of judicial estoppel, on the theory that Mr. Combs lack standing to pursue his

---

[18] *Gillman v. Ford* (*In re Ford*), 492 F.3d 1148, 1155-56 (10th Cir. 2007) (citations and quotation marks omitted). The Court notes that reopening would not prejudice the creditors in any way.

discrimination case, and on a more nebulous theory, that Debtors have simply waited too long to seek to reopen their case and amend the schedules. But Cordish's judicial estoppel and standing theories are not properly raised in this proceeding. Both of those theories are defenses to the discrimination case, and can only be properly raised in the district court where that case is proceeding. The matter before this Court is limited to the questions of reopening and amending schedules; whether Mr. Combs is judicially estopped, or lacks standing, do not directly bear on that decision.[19]

The Court has reviewed the elements of judicial estoppel, as set out by the Supreme Court and as applied in the Eighth Circuit (the Circuit in which the Missouri Western District Court resides). Judicial estoppel requires that, first, a party's later position be clearly inconsistent with its earlier position; second, the party has succeeded in persuading a court to accept that party's earlier position; and third, the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.[20]

Tying these requirements together, there seems to be an overall

---

[19] The Court notes that allowing Debtors to reopen this case and schedule the lawsuit would likely eliminate the standing issue entirely, given the Trustee's intent to abandon the claim.

[20] *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

requirement of deliberateness—judicial estoppel seeks "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."[21] In other words, "the rule is intended to prevent improper use of judicial machinery."[22]

In the Tenth Circuit, this is interpreted broadly. "Where a debtor has both knowledge of the claims and a motive to conceal them, courts routinely, albeit at times sub silentio, infer deliberate manipulation."[23] The law in the Eighth Circuit is interpreted more narrowly, and courts there do not infer deliberate manipulation from knowledge and motivation, but instead require something beyond mere inadvertence.[24] Here, then, Cordish's judicial estoppel arguments require, at a minimum, that Combs knew that he had a discrimination claim against Cordish before he filed bankruptcy, that he had a motive that led him to hide the claim, and that he did so in order to

---

[21] *Id.* at 749–50 (internal citation and quotations omitted).

[22] *Id.* at 750 (internal quotations omitted).

[23] *Queen v. TA Operating, LLC*, 734 F.3d 1081, 2013 WL 4419322 (10th Cir. August 20, 2013).

[24] *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1049 (8th Cir. 2006)("A rule that the requisite intent for judicial estoppel can be inferred from the mere fact of nondisclosure in a bankruptcy proceeding would unduly expand the reach of judicial estoppel in post-bankruptcy proceedings and would inevitably result in the preclusion of viable claims on the basis of inadvertent or good-faith inconsistencies. . . . Courts should only apply the doctrine as an extraordinary remedy when a party's inconsistent behavior will result in a miscarriage of justice.").

14

manipulate the system.

If these allegations were true, as Cordish argues, they would also be sufficient to establish that Combs was seeking to reopen his bankruptcy case and amend his schedules in bad faith,[25] which is why this Court will evaluate these elements. If Combs sought to reopen his bankruptcy in bad faith, the Court would exercise its discretion to deny the Motion to Reopen.

For this reason, the Court will construe Cordish's estoppel argument as alleging the bad faith necessary to deny Debtors' Motion to Reopen to amend their Schedule B. When, as here, a party has failed to disclose an asset, "inadvertent omission may be an affirmative defense to a debtor's failure to disclose an asset in bankruptcy. Inadvertence can be established by showing, among other things, either (1) the debtor had no knowledge of the undisclosed asset, or (2) the debtor had no motive to conceal it. The burden of establishing inadvertence lies with the debtor."[26]

For the reasons articulated below, the Court finds no bad faith on the part of Debtors. Debtors have met their burden of demonstrating that their omission of the claim from Schedule B was inadvertent. Their failure to list the claim was inadvertent because they had no knowledge that the P&L

---

[25] *In re Ford*, 492 F.3d at 1155-56.

[26] *Id.*

incident constituted "property" or an "asset" that had to be disclosed, and when they filed bankruptcy, they had no motive to conceal it.[27] There is no evidence that Debtors sought to manipulate the court system.

In short, I find no evidence even suggesting that Debtors failed to disclose this claim in bad faith. Combs testified that, after the first allegedly discriminatory incident, he immediately felt that he had been discriminated against and that he felt harmed by that discrimination, but he had no idea that this incident could be considered a legal claim at that time. He testified that he did not understand, or believe, that he had a claim until almost three years later, in 2014, when media reports surfaced alleging that the owners of the P&L District hired white men ("rabbits") to attack black patrons for the purpose of getting those patrons thrown out of the P&L District by security guards (among other illegal plans allegedly designed to dissuade black patrons from frequenting bars and restaurants connected to Cordish).

As Combs convincingly argues, most people would not consider every rude action they might experience in everyday society could constitute a cause of action that must be disclosed in a bankruptcy filing lest it be forever lost.

---

[27] The fact that the Trustee has indicated an intent to abandon any claim the estate may have as a result of the one pre-bankruptcy filing P&L incident also buttresses the point that the Combs would not have had a motive to hide the "asset," since standing alone, the Trustee believes it likely has little value to administer.

16

That would be nonsensical, and indeed, that is not the standard. When a debtor—especially one with no legal training like Mr. Combs—does not know, and has no reason to know, that he has a potential cause of action, he should not be punished for failing to disclose the inchoate claim. And, the Court is convinced, that is the case here.

At the time Combs filed bankruptcy, he simply had not connected the dots leading to his discrimination claim, and indeed he was under no obligation to do so. Only after the second and third incident, coupled with the publication of the media reports almost three years later, could Combs have reasonably understood he might have a claim. There is no evidence suggesting that Combs thought, or realistically should have thought, he had a claim when he filed bankruptcy.

Based on the evidence, I conclude that Combs did not know that he had any potential claim at the time he filed bankruptcy. Moreover, I find no evidence that Combs deliberately changed his litigation position in order to manipulate the court system. He never knowingly mislead the bankruptcy court, the trustee, or his creditors by misrepresenting the existence of his claim. I find no evidence of any bad faith on the part of the Debtors.

One of the few examples Cordish supplies to support its allegation that Combs tried to conceal his bankruptcy from the district court (or Cordish)

derives from an objection Combs' lawyer interposed to an interrogatory in the Missouri case, in November 2014. That interrogatory requested he disclose all lawsuits or administrative proceedings to which he had ever been party, specifically mentioning any bankruptcy cases. The answer Combs filed included an objection to the interrogatory as not limited in scope, as having no relation to his claim of discrimination, and as over broad and vague.

No evidence was presented that Cordish tried to compel an answer to the interrogatory (or that Combs ever lied about filing bankruptcy), so apparently Combs has not yet been required to provide a substantive response to the interrogatory. Cordish presented no evidence that it (or the district court) was mislead by this objection, and while this Court does not prefer this kind of litigation tactic exercised by some attorneys, it is not per se bad faith to object to such an interrogatory. More importantly, it provides no support for Cordish's attempt to show Combs was acting in bad faith by trying to "hide" his publicly filed bankruptcy, because only 5 days later, during a deposition, Combs volunteered that he had filed bankruptcy in response to a question about stressors in his life. Combs' willingness to discuss his bankruptcy in response to a question whose purpose was not even to ask him directly about the bankruptcy is further evidence that he had no intent to hide the filing.

This Court simply does not buy the argument that this (regrettably)

normal part of civil litigation—vigorous objections to interrogatories, many of which should just be answered—somehow proves that Combs was attempting to mislead the Court. Once again, the Combs were very credible witnesses, and the Court believed Mr. Combs when he testified he simply trusted his attorney in how she recommended they deal with the written discovery, and that he had nothing to hide.

Cordish also alleges that the Combs were acting in bad faith when their bankruptcy lawyer prematurely filed an amended Schedule B,[28] because it lists the potential value of the discrimination lawsuit as "unknown," when during a mediation Combs sought $20 million in damages. Cordish construes this as another effort to mislead the Court, or perhaps the Trustee.

But once again, Combs testified very credibly that he has no idea what value a jury would place on his claim, that he was required in the mandatory mediation process to pick a number, that he picked one that would compensate him **and** a class of African Americans who he thinks have been similarly discriminated against, and that stating the value as "unknown" is completely

---

[28] For future cases, the Court advises Debtors' bankruptcy counsel that the proper method is to attach the proposed amended Schedule B as an exhibit to the Motion to Reopen.

19

accurate.[29] The large dollar value requested to start a mediation is largely irrelevant in determining whether a jury will elect to award any damages, let alone the dollar value a jury or other finder of fact might actually award as damages. Listing the claim with an unknown value is entirely appropriate at this stage in litigation and in this type of case, as it provides information to the Trustee to enable him to investigate the claim and determine whether it is an asset that is worthy of administration. And in this case, the Trustee has had a much better opportunity than most trustees would to evaluate the claim, because the suit has actually been filed, discovery is apparently complete, a summary judgment motion with much attached evidence has been filed, and the case is ready to go to trial in fewer than two months. The listing of the asset with a value of "unknown" provides no support for Cordish's claim that the Combs are proceeding in bad faith.

Cordish generally argues that granting this motion to reopen would amount to allowing Debtors to attack the integrity of the judicial process because they would be allowed to take inconsistent positions—failing to list

---

[29] Apparently the Western Missouri court declined to certify a class, and Cordish tried to undermine Mr. Combs' credibility by stating he had not amended his claim, to reduce it, after the class action was denied. The Court does not find this fact, if true, an example of deception by Combs, but instead, a part of the civil litigation process because Cordish did not suggest why Combs, at this post-mediation point in the litigation, would have been required to amend his oral damage claim.

the suit in the bankruptcy court but prosecuting a claim in the district court. This argument fails, too. In a case like this, where there is simply no credible evidence that either Dante or Alicia Combs were gaming the system or had any reasonable cause to know Mr. Combs might have a claim on the date they filed the bankruptcy petition, the real harm to the judicial system would be to allow a defendant to totally escape defending against (or suffering a damage verdict for) an alleged wrongdoing under a judicial estoppel theory.

Finally, Cordish argues that Debtors failed to file this motion to reopen within a reasonable time. As a preliminary matter, there is a valid question whether Debtors were under any obligation to disclose the claim at all. As discussed above, after the first, single incident, the claim was so inchoate as to not merit disclosure. It is more likely than not that Debtors would not have had any idea that the incident he was involved in potentially constituted an actionable discriminatory event on which he could base a claim. Although Debtor eventually filed suit under 28 U.S.C. § 1981, and § 1981 claims accrue at the time of the unlawful act,[30] the Court finds it implausible that Debtor would have had a viable claim after the first alleged incident.

In the Tenth Circuit, a claim is an asset of the estate if it "is sufficiently

---

[30] *Edwards v. Boeing*, 996 F.2d 310, 1993 WL 214566 at *3 (10th Cir. 1993) (unpublished).

rooted in the pre-bankruptcy past."[31] The decided weight of these claims of discriminatory treatment come from the second and then the third incidents—when what appeared to be an isolated incident started to look less isolated and innocent and more as the start of an emerging pattern. And even after all three incidents, Combs still filed no action. It was only when, three years post-petition, Combs learned of the 2014 allegations concerning Cordish's possible broader actions, that Combs should have (and did) realize that the three incidents might constitute a meritorious claim.

Accordingly, because of the way these incidents evolved, they are rooted in Debtors' post-bankruptcy future, not their past. The Court will not punish Debtors for failing to disclose a claim that did not exist, in any viable sense, until well after the Debtors filed for bankruptcy. Under these circumstances, I find the motion was filed within a reasonable time. Combs testified very credibly that he had no reason to understand the one pre-petition incident could be deemed to be an asset that had to be disclosed, and immediately after he became aware of his duty to disclose that claim, he moved to reopen his case to do so. Given the nature of the claim, it is difficult to imagine how he could have reopened in a more reasonable time.

---

[31] *Clementson v. Countrywide Financial*, 464 F. App'x. 706 (10th Cir. 2012), citing *Segal v. Rochelle*, 382 U.S. 375, 380 (1966).

22

Because the Court finds the Combs' explanations for why they did not initially list the potential claim in their bankruptcy schedules very credible, because there is no credible evidence that Mr. Combs even knew he was taking a potentially inconsistent position in his bankruptcy action versus his federal court lawsuit, and no evidence presented during the evidentiary hearing painted Combs as attempting to hide the true facts or undermined his credibility on these issues, the Court grants the Motion to Reopen to allow the amendment.[32]

### # # #

---

[32] Again, counsel for Combs should have awaited the ruling on the Motion to Reopen prior to filing the amended Schedule B (which was filed as Doc. 27, one day after the motion). The Court, however, deems this error harmless, and finds it would be pointless to strike it at this juncture and require it be refiled.

23